IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

AARON M. QUINN,

        Plaintiff,

   vs.                         Civil Action 2:07-CV-187
                                 Magistrate Judge King

OHIO STATE HIGHWAY PATROL,
*et al.*,

        Defendants.

## OPINION AND ORDER

This is an action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), in which plaintiff, proceeding without counsel, alleges that defendants failed to accommodate his disability, resulting in the termination of plaintiff's employment by disability retirement.  With the consent of the parties, 28 U.S.C. § 636(c), this matter is before the Court on *Defendants' Motion for Summary Judgment*, Doc. No. 32 ("*Motion for Summary Judgment*").  For the reasons that follow, the *Motion for Summary Judgment* is **GRANTED**.

I.    BACKGROUND

    A.    **Overview of Plaintiff's Employment With the Ohio State Highway Patrol**

Plaintiff is a 36 year-old man who is six feet, ten inches tall and who weighs 243 pounds.  *Deposition of Aaron M. Quinn* ("*Quinn Depo.*"), pp. 11, 13, Doc. No. 29.  He was employed by the Ohio State Highway Patrol ("the Patrol") in various civilian capacities between 1993 and 1997. *Id*. at 21-22.  In February 1997, plaintiff was accepted into the Patrol academy, graduated in June of that year and was

commissioned as an officer.  *Id*. at 22.  Plaintiff's first assignment
was as a trooper with the Circleville Highway Patrol Post and, after
approximately a year and a half, he transferred to a lateral patrol
post in West Jefferson.  *Id*.  Approximately two years later, plaintiff
qualified for and was promoted to the rank of Sergeant.  *Id*. at 22-23.
In approximately 2002, plaintiff was assigned as Sergeant with the
Wilmington post.  *Id*. at 23.  After a temporary assignment in Columbus
one year later, plaintiff was transferred to the Circleville post
where he remained until November 2005, when he went on disability
separation.  *Id*.[1]

**B.  Vehicle Assigned to Plaintiff**

In 1997, when plaintiff became a trooper, his patrol vehicle was
a Ford Crown Victoria.  *Id*. at 58.  This vehicle did not contain a
protective cage and his shotgun was secured under the front driver's
seat in a pouch.  *Id*. at 58-59.  The vehicle had bucket seats and a
radio console near the dash board.  *Id*. at 58, 63.  Plaintiff could
sit up straight and move his seat back as far as he needed to
accommodate his frame.  *Id*. at 59-63.

In 2001 or 2002, around the time that plaintiff was promoted to
Sergeant, the shotgun rack was moved to the interior roof of the
vehicle behind the driver's head, running from the driver's side to
the passenger's side.  *Id*. at 59.  In 2003 or 2004, the Patrol issued

---

[1]While in Circleville, plaintiff passed a promotional exam for the
position of Lieutenant.  *Id*. at 23.  Once a person passes this exam, he or she
does not immediately become a Lieutenant, but is placed on the promotional
list for five years or until promoted.  *Id*. at 118.  A person must repeat the
testing process if not accepted to a Lieutenant's position within five years.
*Id*. at 119.  Plaintiff testified that he passed his examination and was
eligible for promotion to Lieutenant.  *Id*. at 119-20.

new, white patrol vehicles that contained protective cages directly behind the driver and passenger seats. *Id*. at 61-62. Around that time, the radio system in the patrol vehicles was upgraded, with a console mounted from the front dash board between the two front seats, running to the back seat of the vehicle. *Id*. at 62. This upgraded radio console prevented a driver from moving his or her legs to the middle of the vehicle, reducing the sitting area in the front of the vehicle. *Id*. at 62-63. In addition, a driver sat up higher in this patrol vehicle, reducing head room. *Id*. at 60. The newly added protective cage, which was bolted down behind the front seats of the vehicle, also restricted the driver's ability to move back the front seat. *Id*.

C. **Plaintiff's Duties as a Sergeant and Discomfort Caused By Certain Duties**

As a Sergeant, plaintiff usually worked the midnight shift,[2] handling traffic stops and overseeing troopers. *Id*. at 43-45; Exhibit 3.[3] Plaintiff also performed administrative work, which required that he sit at a desk. *Quinn Depo*., pp. 47-48; Exhibit 3. During a typical shift, plaintiff spent approximately five to six hours driving in his patrol vehicle and approximately three hours performing administrative work. *Quinn Depo*., p. 54. Plaintiff drove his patrol vehicle to and from work. *Id*. at 43-45, 57-58.

Certain duties caused plaintiff discomfort. *Id*. at 48-49, 56-57.

---

[2]The hours for the overnight shift varied, ranging from midnight to 8:00 a.m.; 10:00 p.m. to 6:00 a.m.; or 11:00 p.m. to 7:00 a.m. *Id*. at 45-46. In late 2005, plaintiff worked 11:00 p.m. to 7:00 a.m. *Id*. at 46.

[3]Defendants separately filed the exhibits to plaintiff's deposition. *See* Doc. No. 30.

First, sitting in a cramped or confined space, including sitting at
his desk or in his patrol vehicle, was uncomfortable.  *Id*.  In
particular, plaintiff's patrol vehicle contained an overhead shotgun
rack and protective cage behind his seat, which prevented him from
sitting in an upright position.  *Id*. at 56-60.  Second, repeatedly
entering and exiting his patrol car, approximately 20 to 25 times
during an average shift, caused back pain.  *Id*. at 56-57.

Plaintiff noticed problems with his back in 2003 or 2004 when he
was issued the white patrol car with the protective cage.  *Id*. at 62,
65.  At first, plaintiff experienced a discomfort in his neck and
upper back when exercising, but the discomfort went away after a
couple of days when he ceased exercising.  *Id*. at 65.  As time passed,
plaintiff's pain was more frequent and lasted longer, occurring even
when he was not exercising.  *Id*. at 65-66.  The pain prevented
plaintiff from turning his neck to look at people in the back seat of
his patrol vehicle; he eventually had to turn his whole body to see
someone in the back seat.  *Id*. at 66.  The pain also caused nausea,
which in turn affected plaintiff's eating habits.  *Id*.  In addition,
the pain affected his sleeping habits because he could not find a
comfortable position.  *Id*.  Plaintiff testified that he was unable to
feel "normal" and the pain bothered him no matter what he was doing.
*Id*. at 67.  In October 2005, plaintiff testified, the pain "got to the
point where I couldn't function in my job."  *Id*. at 66-67.

**D.    Plaintiff's Medical Treatment and Requests for Transfers and
        Promotions**

In October 2005, plaintiff sought treatment for his back from Dr.
Michael Monroe, a chiropractor in West Jefferson.  *Id*. at 66, 68;

4

Exhibit 4, p. 8.  During plaintiff's first visit, Dr. Monroe
administered x-rays, performed a heat scan and manipulated plaintiff's
spine.  *Quinn Depo.*, p. 68.  At the end of the appointment, Dr. Monroe
recommended that plaintiff return for manipulation and rehabilitation
at least three times per week.  *Id.* at 68-69.  He also recommended as
a "temporary solution" that plaintiff request the removal of the
overhead shotgun rack and cage or a "permanent solution" that
plaintiff request a lateral transfer from his current position.  *Id.*
at 68-70.

On October 19, 2005, plaintiff hand-delivered an "Inter-Office
Communication" ("IOC") to his immediate supervisor and post commander
at Circleville, defendant Lieutenant Patrick B. Vessels ("Lieutenant
Vessels").  *Id.* at 55, 71, 74; Exhibit 5.  Plaintiff also addressed
the IOC to the District Commander and Lieutenant Vessels's superior,
defendant Captain Clark Kiner ("Captain Kiner").  *See Quinn Depo.*, pp.
55, 71; Exhibit 5.  Plaintiff requested a vehicle that did not contain
a protective cage.  Exhibit 5.  He also asked that the overhead
shotgun rack be moved or that he be issued a folding shotgun that can
be stored in front of the driver's seat.  *Id.*  Plaintiff explained
that neck and back pain and a recent visit to a chiropractor had
prompted this request.  *Id.*  He further stated that he was unable to
wear his Stetson hat inside his vehicle and had to put it on each time
that he exited the vehicle, thereby "creat[ing] a risk when I have a
violator stopped."  *Id.*; *Quinn Depo.*, pp. 72-73.

Plaintiff received no response to his October 19, 2005, IOC.
*Quinn Depo.*, pp. 82-83.  On November 6, 2005, plaintiff sent a second
IOC to Lieutenant Vessels.  *Quinn Depo.*, pp. 75-76; Exhibit 6.

5

Plaintiff described his neck and back pain and chiropractic treatment. Exhibit 6. Plaintiff stated that, other than his problems with the repetitive movement associated with climbing in and out of a patrol vehicle, he has no physical limitations. *Id. See also Quinn Depo.*, p. 76. His chiropractor advised that he work in a position that was "off of the road." Exhibit 6. Plaintiff therefore requested that he be transferred to the Patrol Training Academy. *Id*.

Plaintiff also spoke with Lieutenant Vessels on November 6, 2005. *Quinn Depo.*, pp. 85-86; Exhibit 4, p. 3. Lieutenant Vessels told plaintiff that "he would send my request up through the chain of command." *Quinn Depo.*, p. 86. Plaintiff spoke with Lieutenant Vessels on subsequent occasions. *Id*. at 86-87. In one phone call, plaintiff explained that he needed the modification to his vehicle in order to return to work. *Id*. at 86.

In November or December of 2005, plaintiff spoke with defendant Captain Kevin Teaford ("Captain Teaford"), Executive Officer of Human Resources, whom plaintiff knew personally. *Quinn Depo.*, pp. 55-56, 83-85; Exhibit 4, p. 3. They discussed plaintiff's physical condition and plaintiff's request for a transfer; plaintiff asked what he needed to do to continue working for the Patrol. *Quinn Depo.*, pp. 84-85. They discussed plaintiff's options and Captain Teaford told plaintiff that "he wished the very best for me and would do anything he could to help." *Id*. at 85. Plaintiff left the meeting feeling better and feeling that "I was going to get the help that I requested." *Id*.

In March 2006, plaintiff again spoke with Lieutenant Vessels and a secretary, Sherry Ford. *Quinn Depo.*, pp. 86-88; Exhibit 4, p. 3. Plaintiff and Lieutenant Vessels discussed lateral transfers for

6

plaintiff.  *Quinn Depo.*, p. 88.  In particular, plaintiff asked Ms. Ford to enter his verbal request for a lateral position as Sergeant for licensing and commercial standards.  *Id*. at 103-05.  Plaintiff did not receive verification that his request had been entered into the system and he does not know if he was the most qualified applicant for that job.  *Id*. at 106-07.

During this conversation, Lieutenant Vessels also asked plaintiff when he would return to work if he were issued a modified patrol vehicle.  *Id*. 86-88.  Plaintiff responded that would return "tonight at 11:00."  *Id*. at 87.  During that same or a later conversation, Lieutenant Vessels told plaintiff that he would give plaintiff his vehicle, which had a shotgun rack, but no protective cage.  *Id*. at 89.  Plaintiff responded that he would like that vehicle if the shotgun rack were removed.  *Id*.  Plaintiff heard nothing more about obtaining this vehicle.  *Id*.

On March 23, 2006, plaintiff applied for a Sergeant position in technology and communication services.  *Id*. at 107-08.  Plaintiff received no response to this request; he does not know if he was the most qualified applicant for the job.  *Id*. at 108.  Plaintiff also requested a transfer to another Sergeant position with capital operations.  *Id*. at 108-09.  Again, plaintiff did not receive a response and does know if he was the most qualified applicant for that position.  *Id*. at 109.

In April 2006, after plaintiff passed the promotional test for Lieutenant, he notified the Patrol of 17 positions that he would accept as a promotion to Lieutenant.  *Id*. at 109-15; Exhibit 4, pp. 5-7.  Plaintiff has never received a response to these requests and does

7

not know if he was the most qualified applicant for the positions. *Id.* at 113.  Plaintiff remains on the active promotional list.  *Id.*

Plaintiff also spoke with defendant Captain Clarke Kiner ("Captain Kiner") regarding plaintiff's request for a lateral transfer.  *Quinn Depo.*, pp. 92-94.  Captain Kiner suggested that plaintiff contact the major commandant in charge of the Academy.  *Id.* at 93.  Plaintiff called the major's secretary and left a message, but did not receive a return call.  *Id.*

**E.   Plaintiff's Request for ADA Accommodation**

On December 21, 2005, Major Robert J. Young ("Major Young"), Commander of the Patrol's Office of Human Resource Management, notified plaintiff that his office had received information that plaintiff may have a qualifying disability under the ADA.  *Quinn Depo.*, pp. 137-38; Exhibit 13, p. 1.  Major Young advised that, if plaintiff intended to exercise rights under the ADA, plaintiff's physician must complete and return a particular form within two weeks. Exhibit 13.

On December 29, 2005, Dr. Monroe completed the form, marking "Yes" in answer to the question whether plaintiff had a physical or mental impairment that substantially limits one or more major activities, had a record of such an impairment, or was regarded as having such impairment.  *Quinn Depo.*, pp. 138-39; Exhibit 14, p. 2. Dr. Monroe attached a letter explaining that "[a] temporary solution for Mr. Quinn would be to remove the cage and shotgun rack from the vehicle.  A permanent solution for Mr. Quinn would be a position that did not require frequent in and out of a patrol vehicle or a position that did not require him to be in a cramped or confining position for

8

extended periods of time."  Exhibit 14, p. 1.[4]

**F.   Request for Lateral Transfer and Transitional Return to Work Program**

On January 18, 2006, plaintiff wrote a letter to defendant Colonel Paul McClellan ("Colonel McClellan"), asking for a lateral transfer as a Sergeant to the Training Academy to assume the position of a Lieutenant who had been temporarily reassigned.  *Quinn Depo.*, pp. 140-43; Exhibit 15.  Plaintiff explained that he understood that such position would be temporary, but would work to the mutual benefit of plaintiff and the Patrol.  *Id.*

On January 20, 2006, Major Young denied plaintiff's request for transfer to the Academy.  Exhibit 16.[5]  Major Young learned that the Patrol had previously offered plaintiff the opportunity to enter a Transitional Return to Work ("TRW") program.  *Id.*  According to Major Young, the TRW program would provide plaintiff the opportunity to return to work in a limited duty capacity at his current assignment for up to 90 days at his full salary and employee benefits.  *Id.*  The Patrol would expect plaintiff to return to full and unrestricted duty after the 90-day period.  *Id.*  Major Young further advised that the offer to enter this program remained available to plaintiff.  *Id.*

Plaintiff rejected the offer to enter the TRW program.  *Quinn Depo.*, pp. 144-48.  Plaintiff explained to Lieutenant Vessels that entering the program "would simply prolong what had already happened":

---

[4]It is unclear to the Court what the outcome was of this internal ADA submission.

[5]Plaintiff does not know who filled the Lieutenant's position or whether plaintiff was the most qualified person for the position.  *Quinn Depo.*, p. 143.

when he returned to working inside his vehicle at the end of 90 days,
riding in the vehicle "would have continued to exacerbate my condition
from where my impairment stemmed." *Id.* at 146.

**G.    Application for Disability Retirement**

In approximately February 2006, plaintiff requested disability
retirement through the Ohio State Highway Patrol Retirement System.[6]
*Quinn Depo.*, pp. 148-49.  In connection with plaintiff's application,
Dr. Monroe completed the "Attending Physician Medical Evaluation."
*Quinn Depo.*, pp. 148-50; Exhibit 17.  Dr. Monroe summarized
plaintiff's physical condition: "Overall, Mr. Quinn's physical
condition is exceptional.  He is only limited by the restrictions in
the patrol car.  Other than sitting in a patrol car for extended
period of time day after day, he is able to perform all duties
expected of a Patrolman." Exhibit 17, p. 2.  Dr. Monroe checked the
box next to the statement, "Totally incapacitated to perform specific
job duties and responsibilities in the employ of the patrol, and that
such incapacitation is permanent." *Id.*; *Quinn Depo.*, pp. 149-50.

Subsequently, in March 2006, plaintiff was sent to a physician
for an independent medical examination. *Quinn Depo.*, pp. 152-53;
Exhibit 18.  William R. Fitz, M.D., a specialist in physical medicine
and rehabilitation, examined plaintiff and concluded that plaintiff

---

[6]The Ohio Highway Patrol Retirement System is managed by the state
highway patrol retirement board.  O.R.C. § 5505.04.  "The board may sue and be
sued, plead and be impleaded, contract and be contracted with, and do all
things necessary to carry out this chapter."  O.R.C. § 5505.04(A)(1).
Membership in the retirement system is mandatory for all state highway patrol
employees.  O.R.C. § 5505.02.  Upon application, a member of the state highway
patrol retirement system "who becomes totally and permanently incapacitated
for duty in the employ of the state highway patrol may be retired by the
board."  O.R.C. § 5505.18(A).

suffered from mild upper thoracic scoliosis.  *Id*.  Dr. Fitz did "not believe that he [plaintiff] is totally incapacitated to perform the specific job duties and responsibilities in the employ of the patrol, and that such incapacitation is permanent."  Exhibit 18, p. 2.

In connection with his request for disability retirement, plaintiff submitted a letter from another chiropractor, Todd S. Rubley, D.C., dated November 10, 2006.  *Quinn Depo.*, pp. 167-68; Exhibit 25.  Dr. Rubley stated that "the only restriction I would have on him is not working in a confined area for proper posture and head movement."  Exhibit 25.

On November 23, 2006, Richard A. Curtis ("Mr. Curtis"), Executive Director of the Highway Patrol Retirement System, notified plaintiff that "the Health, Wellness and Disability Committee ["Committee"] voted to recommend to the [Highway Patrol Retirement] Board ["the Board"] at the December 28, 2006 board meeting that your application for disability retirement from the Ohio Highway Patrol Retirement System be denied."  Exhibit 19; *Quinn Depo.*, pp. 153-58.  Mr. Curtis advised that plaintiff may submit additional medical evidence and that, if he chose to do so, he must so notify Mr. Curtis by December 15, 2006.  Exhibit 19.  If additional evidence were submitted, the Committee would again review his case; otherwise, plaintiff's application would be heard at the board meeting on December 28, 2006. *Id*.  Plaintiff was further advised that once the Board makes a determination, he could not re-file for disability retirement, and he would no longer be a contributing member of the Highway Patrol Retirement System.  *Id*.

The Board ultimately denied plaintiff's application for

disability retirement.  *Quinn Depo.*, pp. 158-59.[7]

### H.  Application for Disability Leave Benefits

In March 2006, plaintiff applied for disability leave benefits.
*Quinn Depo.*, pp. 121-23; Exhibit 8.[8]  As part of this application,
plaintiff's chiropractor, Dr. Monroe, completed the "Attending
Physician Statement."  *Quinn Depo.*, pp. 126-27; Exhibit 8, pp. 2-3.
When responding to the questions regarding restrictions on plaintiff's
work activities and duties that plaintiff cannot perform, Dr. Monroe
indicated that plaintiff is unable to get in and out of the patrol
vehicle repeatedly and cannot sit in the vehicle for long periods of
time.  Exhibit 8, p. 3.  Dr. Monroe also indicated, and plaintiff
agreed, that plaintiff could sit, stand and walk for eight hours.  *Id*.
According to Dr. Monroe, plaintiff could lift up to 50 pounds
constantly and more than 50 pounds frequently and that he could push
or pull more than 100 pounds constantly.  *Id*.

On December 6, 2005, Dr. Monroe completed a "Medical Appraisal of
Job Capacity" for plaintiff.  *Quinn Depo.*, pp. 128-30; Exhibit 9.  Dr.
Monroe indicated that plaintiff could not return to work without
restrictions.  Exhibit 9, p. 1.  However, Dr. Monroe noted that
plaintiff could sit, stand and walk for six to eight hours and could

---

[7]Plaintiff testified that he applied twice for disability retirement and
that his request was denied twice.  *Quinn Depo.*, pp. 154-55, 158-59.
Plaintiff challenged the first denial by providing additional information.
*Id*. at 155.  Plaintiff is uncertain whether Exhibit 19 refers to his first
application for retirement or his second.  *Id*. at 158.

[8]Plaintiff testified that he applied for disability benefits through the
Patrol.  *Quinn Depo.*, pp. 121-25.  However, defendants present evidence that
plaintiff is mistaken and that he actually applied for disability leave
benefits through the Ohio Department of Administrative Services ("ODAS").  *See
Affidavit of Brian Landis* ("*Landis Aff.*"), ¶ 4, attached to *Motion for Summary
Judgment.*

return to work full-time "so long as not in car[.]" *Id*. Dr. Monroe elaborated that a spinal curvature caused plaintiff's physical limitations; plaintiff did not have an injury, but had a condition that was continually aggravated by repetitive movements out of a low-domed vehicle. *Id*. at 2. Plaintiff agreed with Dr. Monroe's assessment. *Quinn Depo.*, pp. 129-30.

In December 2005, Dr. Monroe prepared letters, which plaintiff delivered to the benefits section of the Patrol and to ODAS. *Quinn Depo.*, pp. 131-34; Exhibit 10. In the letter to the Patrol, Dr. Monroe stated that plaintiff's "condition is permanent. Continued repetitive movements in and out of or constant sitting in a patrol vehicle will continue to exacerbate his condition leading to further impairment." *Id*. at 1. In the letter to ODAS, Dr. Monroe stated that plaintiff's height and the low-dome of the police cruisers continually aggravated his spine. *Id*. at 2. Plaintiff's inability to sit up straight inside the vehicle and having to duck his head every time he exits the vehicle constituted a "repetitive trauma." *Id*.

On February 9, 2006, ODAS notified plaintiff that his application for disability leave benefits had been approved for the period December 9, 2005 through March 31, 2006. *Quinn Depo.*, pp. 134-36; Exhibit 11, p. 1. Throughout 2006, ODAS periodically notified plaintiff that his disability leave benefits again had been extended. *Quinn Depo.*, pp. 136-37; Exhibit 11. Nevertheless, on July 27, 2006, ODAS advised plaintiff that he must undergo an independent medical examination. *Quinn Depo.*, pp. 165-66; Exhibit 23. On August 22, 2006, Bina Mehta, M.D., another specialist in physical medicine and rehabilitation, examined plaintiff and concluded that "[g]iven that

13

[plaintiff] is extremely tall, which would certainly have caused his pain as a result of long hours of sitting in a patrol car, I feel that his condition is permanent." *Quinn Depo.*, p. 166; Exhibit 24.

ODAS notified plaintiff of continued disability benefits and he received these benefits from November 25, 2005 through December 22, 2006. *Quinn Depo.*, pp. 136-37; Exhibit 11. On December 6, 2006, plaintiff requested that ODAS terminate his disability benefits as of December 23, 2006. *Quinn Depo.*, pp. 135-37; Exhibit 12. Plaintiff requested this termination so that he could access funds in his Patrol retirement account. *Id*. ODAS granted plaintiff's request and terminated his benefits as of December 22, 2006. *Quinn Depo.*, pp. 168-69; Exhibit 26.

### I.  Plaintiff's Disability Separation

In a letter dated May 1, 2006, Major Young notified plaintiff that the Patrol intended to disability separate[9] plaintiff from his position, assuring plaintiff that this was not disciplinary action. *Quinn Depo.*, pp. 159-61; Exhibit 20. Major Young advised that Staff Lieutenant Brian W. Landis would conduct "a pre-separation meeting" on

---

[9] Major Young's letter states that the intention to disability separate plaintiff from plaintiff's employment is "in accordance with Section 123:1-33-03 of the Ohio Revised Code." Exhibit 20. The Ohio Revised Code does not contain such a section. The Court presumes that Major Young intended to refer to the Ohio Administrative Code. The section that was in effect in May 2006 provides that a "*[v]oluntary* disability separation occurs when an employee does not dispute his or her inability to perform the essential job duties of the position due to a disabling illness, injury or condition." Ohio Admin. Code § 123:1-33-03 (2000) (emphasis added). An involuntary disability separation occurs "[w]hen an appointing authority has received the results of a medical or psychological examination and initially determines that an employee is incapable of performing the essential job duties of the employee's assigned position due to the disabling illness, injury or condition[.]" Ohio Admin. Code § 123:1-33-02(B) (2000). These definitions are similar to the current version of the regulations. *See* Ohio Admin. Code §§ 123:1-33-01(A) and 123:1-33-02(A) (2007).

May 15, 2006. Exhibit 20. The meeting would be "an informal meeting and you will not be required to make a decision to retire or be asked to turn in a resignation." *Id*. Major Young further advised that plaintiff was not required to attend and could waive the right to his pre-separation meeting. *Id*. Plaintiff waived his right and did not attend the meeting. *Quinn Depo.*, pp. 159-60.

On May 26, 2006, Kenneth L. Morckel ("Mr. Morckel"), Director of the Ohio Department of Public Safety, notified plaintiff that he had been granted a voluntary disability separation[10] effective November 27, 2005, which was "the last date that [plaintiff] was in active pay status and not receiving disability leave benefits." Exhibit 21; *Quinn Depo.*, pp. 161-63. Mr. Morckel advised plaintiff that "[y]ou remain unable to perform the material and essential job duties in your classification of a State Highway Patrol Sergeant." Exhibit 21. Plaintiff was further advised that he had the right to request reinstatement. *Id*. That right will expire on November 27, 2008. *Id*. According to Mr. Morckel, plaintiff's "health, dental and vision benefits will remain paid as long as your State disability benefits program is approved." *Id*.

Subsequently, plaintiff mailed a letter dated June 21, 2006, to the Patrol's benefits section from Dr. Monroe. *Quinn Depo.*, pp. 163-64; Exhibit 22. Dr. Monroe reiterated that "[t]he only restriction or limitation applicable to Mr. Quinn is sitting or working in a confined area that does not provide sufficient clearance for proper posture and

---

[10] Mr. Morckel states that the voluntary disability separation was "[i]n accordance with Ohio Admin. Code § 123:1-33-03," but as discussed *supra*, the Court presumes that Mr. Morckel intended to refer to Ohio Admin. Code § 123:1-33-02. Exhibit 21.

head movement."  Exhibit 22.

### J.    Charge of Discrimination

On September 22, 2006, plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission, alleging that the Patrol denied his reasonable request for an accommodation and lateral transfer. *Quinn Depo.*, pp. 172-74; Exhibit 28.  Plaintiff specifically alleged that the Patrol discriminated against him because of his disability. *Id.*  On January 8, 2007, the Equal Employment Opportunity Commission notified plaintiff that it is "unable to conclude that the information obtained establishes violations of the statutes."  Exhibit 29.

### K.    Modified Patrol Vehicles

On December 26, 2006, plaintiff wrote a letter to Captain Teaford after plaintiff heard from someone else that the Patrol was modifying its patrol cruisers.  *Quinn Depo.*, pp. 169-71; Exhibit 27.  Plaintiff reiterated the restrictions presented by his physical condition, his medical treatment, his prior requests for lateral transfers and his continued interest in working for the Patrol.  Exhibit 27.  Other than sending this letter to Captain Teaford, plaintiff did not contact anyone else regarding the reported modifications to patrol vehicles. *Quinn Depo.*, p. 171-72.

### L.    Plaintiff's Current Employment and Physical Condition

Plaintiff, who is married with two children, relocated his family from West Jefferson to Jackson, Ohio, in approximately January 2007. *Quinn Depo.*, p. 12.  In December 2007, plaintiff earned a bachelor's degree in criminal justice from the University of Rio Grande ("the University").  *Id.* at 15.  Since July 2007, plaintiff has worked as a

16

campus safety director for the University. *Id*. at 16. Plaintiff's
schedule, which usually extends from 9:00 a.m. to 5:00 p.m., requires
both administrative work at a desk and walking around campus. *Id*. at
18. Plaintiff also volunteers approximately 10-15 hours per week as
an assistant basketball coach at the University. *Id*. at 37-38.

From approximately October 2006 to February 2007, plaintiff
played basketball for the University team, which required regular
practice and training. *Id*. at 33-36; Exhibit 1. Currently, plaintiff
engages in regular exercise, including lifting weights, biking,
jogging and spine strengthening exercises. *Id*. at 24-26. Plaintiff
also owns a horse, which he rides approximately two times per month.
*Id*. at 38-39; Exhibit 1. He can ride without pain while the horse is
cantering or galloping. *Id*.

At home, plaintiff helps with household chores, including
vacuuming, washing dishes, laundry, grocery shopping and using a
riding mower to mow the lawn. *Quinn Depo*., pp. 26-27. However, he
cannot shovel snow in the winter because it bothers his back. *Id*. at
29.

Plaintiff can walk without any problems. *Id*. at 29. He can also
use the restroom, brush his teeth, dress himself, feed himself and
shave without assistance. *Id*. at 29-30. Sitting on a couch or
straight-backed chair does not bother plaintiff; and he can stand up
from a chair without bothering his back. *Id*. He can get out of bed
without assistance. *Id*. at 28-29. However, plaintiff has difficulty
sleeping, and gets up two to three times a night. *Id*. at 27-28.
Plaintiff is uncertain whether this difficulty is attributable to his
spine or due to the number of years that he worked the midnight shift

17

with the Patrol.  *Id*. at 27-28.  On a scale of 1 to 10, his pain is about a 5 when he sleeps.  *Id*. at 28.

Plaintiff testified that he could perform his job duties as Sergeant if there were no shotgun rack or cage in his car.  *Quinn Depo.*, pp. 64-65, 68.  He could also sit in a patrol car for 6 to 8 hours if the rack and cage were removed.  *Id*. at 134, 150.  Plaintiff understands that he can return to work up until November 28, 2008. *Id*. at 171-72.  He has an interest in returning to work, but has never received "official verification in writing" that the accommodations to the vehicle will be made for him.  *Id*.

### M.    Procedural History

Plaintiff filed this action on March 13, 2007.  *See Complaint*, Doc. No. 4.  On November 6, 2007, the Court granted in part and denied in part defendants' motion for judgment on the pleadings.  *Opinion and Order*, Doc. No. 22.  In particular, the Court dismissed all of plaintiff's claims except for the claims for prospective injunctive relief against Colonel McClellan, Captain Teaford, Captain Clarke and Lieutenant Vessels in their official capacities.  *Id*.

## II.  STANDARD OF REVIEW

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which  provides in pertinent part:

> The judgment sought shall be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2007).  Pursuant to Rule 56(c), summary judgment

is appropriate if "there is no genuine issue as to any material fact . . . ." *Id*. In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

19

475 U.S. 574, 586 (1986)).

In this case, plaintiff is proceeding without the assistance of counsel.  A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than are formal pleadings drafted by lawyers.  *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A court should make a reasonable attempt to read the pleadings of a pro se litigant to state a valid claim on which the plaintiff could prevail, despite any failure to cite proper legal authority, confusion of various legal theories, poor syntax and sentence construction, or unfamiliarity with pleading requirements.  *Ashiegbu v. Purviance*, 74 F. Supp. 2d 740, 749 (S.D. Ohio 1998) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).  "This standard does not mean, however, that pro se plaintiffs are entitled to take every case to trial."  *Id*. at 746 (citing *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996)).  "Indeed, courts should not assume the role of advocate for the pro se litigant."  *Id*. (citing *Hall*, 935 F.2d at 1110).

**III. DISCUSSION**

**A.    ADA Standard**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual. . . ."  42 U.S.C. § 12112(a); *see also Roush v. Weastec*, Inc., 96 F.3d 840, 843 (6th Cir. 1996).  An employee who believes that he has been discriminated against in his employment may present either direct evidence of discrimination or circumstantial evidence sufficient to create an inference of discrimination.  *Gantt*

20

*v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998).
Here, plaintiff has presented no direct evidence of discrimination.
Thus, plaintiff must present circumstantial evidence sufficient to
create an inference of unlawful discrimination.

The evidentiary framework to be applied in an ADA case where the
plaintiff has presented circumstantial evidence in support of his
claim of discrimination is that established by the United States
Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792
(1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248
(1981). *Id. See also Sullivan v. River Valley School Dist.*, 197 F.3d
804, 810 (6th Cir. 1999). Under the *McDonnell Douglas/Burdine*
framework, the plaintiff must carry the initial burden of setting
forth a *prima facie* case of discrimination. *McDonnell Douglas*, 411
U.S. at 802. To establish a prima facie case of employment
discrimination under the ADA, a plaintiff must show the following:

(1) that he is disabled;

(2) that he is otherwise qualified for his position, with or
without reasonable accommodation;

(3) that he suffered an adverse employment decision;

(4) that the employer knew or had reason to know of the
plaintiff's disability; and

(5) that the position remained open while the employer
sought other applicants or the disabled individual was
replaced.

*Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779
(6th Cir. 1998) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d
1173, 1186 (6th Cir. 1996) (internal citations omitted)); *Gantt*, 143
F.3d at 1047.

If the plaintiff establishes a *prima facie* case, the burden then

21

shifts to the defendant employer to articulate some legitimate, nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802; *Gantt*, 143 F.3d at 1047 n.5.  If the defendant carries this burden of production, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Burdine*, 450 U.S. at 253.  At all times, however, the plaintiff retains the ultimate burden of persuasion.  *Id.* at 256.

In the case *sub judice*, defendants contend that plaintiff cannot meet his burden of establishing a *prima facie* case of disability discrimination because he cannot show that he is disabled as that term is defined by the ADA.  *See Motion for Summary Judgment*, pp. 16-24. The Court agrees.

**B.    "Disability" under the ADA**

Under the ADA, the term "disability" is defined, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]"  42 U.S.C. § 12102(A).  "Major life activities are 'activities that are of central importance to daily life.'"  *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002) (quoting *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 185 (2002)).  Major life activities include, but are not limited to, "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking,

22

breathing, learning and working."  45 C.F.R. § 84.3(j)(2)(ii).[11]

"Substantially limits" is defined as the inability to perform or a severe restriction on the condition, manner or duration under which an individual can perform a particular major life activity, as compared to the average person in the general population. *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 315 (6th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(1)).  The determination of whether an impairment substantially limits a major life activity requires consideration of "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (citing 29 C.F.R. § 1630.2(j)(2)).  "Generally, short-term, temporary restrictions are not substantially limiting." *Roush*, 96 F.3d at 843.  *See also Hein v. All Am. Plywood Co.*, 232 F.3d 482, 487 (6th Cir. 2000) (same); *Brock v. United Grinding Tech., Inc.*, 257 F. Supp.2d 1089, 1094 (S.D. Ohio 2003) (Rice, J.) (same).  "[T]hese terms ['major life activities' and 'substantially limits'] need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Williams*, 534 U.S. at 197.

In the instant case, it appears that plaintiff posits that he is substantially limited in the major life activities of sitting, sleeping, lifting and working. *Motion for Summary Judgment*, pp. 19-

---

[11]Although no agency, including the Equal Employment Opportunity Commission, has authority "to issue regulations implementing the generally applicable provisions of the ADA[,]" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479 (1999), the parties have not objected to the use of these regulations for guidance.

23; *Plaintiff's Response to Defendant's* [sic] *Motion for Summary
Judgment* ("*Plaintiff's Response*"), Doc. No. 33.  The Court will
address each activity in turn.

    **1.  Sitting**

    Defendants argue that plaintiff is not substantially limited in
the major life activity of sitting because he has not shown that
sitting in a cramped or confined space is a major life activity, nor
has he shown that his impairment substantially restricts his ability
to sit.  *Motion for Summary Judgment*, pp. 19-20.  Plaintiff does not
specifically respond to defendants' argument in this regard.  *See
Plaintiff's Response*.

    Defendants' argument is well-taken.  Plaintiff's testimony and
the evidence discussed *supra* establish that plaintiff's back and neck
became painful when he sat for periods of time in the cramped patrol
vehicle.  However, plaintiff testified that he can sit without
difficulty while watching television on the couch or in a straight-
backed chair; he can sit on a horse without pain.  *See Quinn Depo.*,
pp. 30, 38-39.  Plaintiff further testified that he could sit in a
patrol vehicle for 6 to 8 hours if the cage and overhead shotgun rack
were removed.  *Id.* at 134.  Dr. Monroe also reported that plaintiff
could sit for 8 hours.  Exhibit 8, p. 3.

    By plaintiff's own admission, then, he is not altogether
precluded from sitting and he is not significantly restricted in his
ability to sit; he has shown that his neck and back pain sometimes
limit his ability to sit under certain circumstances.  Therefore,
simply because plaintiff was uncomfortable sitting in a confined
position does not mean that he is disabled within the meaning of the

ADA, particularly when he is capable of sitting without pain under different circumstances. *See Black v. Roadway Express, Inc.*, 297 F.3d 445, 450-51 (6th Cir. 2002) (finding that doctor's affidavit that plaintiff had restrictions as to, among other things, "sitting in a position where he cannot moderately flex and extend his right leg" did not establish that plaintiff was substantially limited in any major life activity). *Cf. Adams v. Potter*, No. 05-5811, 193 Fed. Appx. 440, 444 (6th Cir. Aug. 22, 2006) ("The number of activities in which [plaintiff] Adams can engage without limitation weakens his argument that he is disabled."); *Agnew v. Heat Treating Servs. of America*, No. 04-2531, 2005 U.S. App. LEXIS 27884, at *12 (6th Cir. Dec. 14, 2005) ("Plaintiff has failed to establish that his back injury precludes him from performing these activities altogether or that he's significantly restricted in performing these activities.  At best, Plaintiff has shown that he has an injury that sometimes limits his ability to perform major life activities[.]").  Considering the nature of plaintiff's back and neck problems, *see Swanson*, 268 F.3d at 315, the Court cannot conclude from the evidence presented in this case that plaintiff is substantially limited in his ability to perform the major life activity of sitting.  *See, e.g., Black*, 297 F.3d at 450-51.

## 2. Sleeping

Defendants contend that plaintiff is not substantially limited in the major life activity of sleeping because any such limitation is only moderate and because plaintiff cannot attribute his difficulty sleeping to his medical condition, *i.e.*, thoracic scoliosis.  *Motion for Summary Judgment*, pp. 21-22.  Plaintiff does not respond specifically to this contention.

25

Defendants' argument is well-taken.  "[A]n individual must make a significant showing of sleep impairment before he can show that a substantial limitation exists."  *Greathouse v. Westfall*, No. 06-5269, 212 Fed. Appx. 379, 382 (6th Cir. Nov. 7, 2006).  Getting less than 8 hours of sleep a night is insufficient to establish a substantial limitation.  *See Swanson*, 268 F.3d at 316 ("While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population."); *Boerst v. Gen. Mills Operations, Inc.*, No. 00-3281, 25 Fed. Appx. 403, 407 (6th Cir. Jan. 15, 2002) ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation.").

As an initial matter, plaintiff admits that he cannot attribute his difficulties sleeping solely to his thoracic scoliosis.  *Quinn Depo.*, pp. 27-28.  Instead, plaintiff concedes that his difficulty may relate to the midnight shifts that he worked with the Patrol.  *Id*.  Accordingly, plaintiff has failed to establish that his thoracic scoliosis substantially limits his ability to sleep.

In addition, as discussed *supra*, plaintiff's difficulty in sleeping consisted of getting up two to three times per night with pain level of 5 out of a 10-point scale.  These moderate inconveniences are insufficient to meet the high level of severity required to find that plaintiff's ability to sleep is substantially limited.  *See*, *e.g.*, *Greathouse*, 212 Fed. Appx. at 382; *Swanson*, 268 F.3d at 316; *Boerst*, 25 Fed. Appx. at 407.

**3.    Lifting**

Defendants argue that plaintiff cannot establish that he is substantially limited in the major life activity of lifting. *Motion for Summary Judgment*, p. 22. Plaintiff does not specifically respond to defendants' argument.

The Court does not construe plaintiff's claims to include an allegation as to the major life activity of lifting. However, to the extent that plaintiff may assert such an allegation, the Court agrees that plaintiff has failed to meet his burden. "Federal case law supports that a maximum weight restriction is not a disability as defined by the ADA." *Law v. City of Scottsville*, No. 98-6335, 2000 U.S. App. LEXIS 14512, at *12 (6th Cir. June 15, 200). *See also Gayer v. Cont'l Airlines, Inc.*, No. 00-3887, 21 Fed. Appx. 347, 350 (6th Cir. Oct. 2, 2001); *McKay v. Toyota Motor Mfg. U.S.A.*, 110 F.3d 369 (6th Cir. 1997) (determining that plaintiff who, among other things, was restricted to lifting no more than 10 pounds was not disabled).

In the instant case, Dr. Monroe reported that plaintiff could lift up to 50 pounds constantly and more than 50 pounds frequently and that he could push or pull more than 100 pounds constantly. Exhibit 8, p. 3. Plaintiff also testified that he regularly lifts weights up to 40 pounds for approximately 15 to 20 minutes at a time. *Quinn Depo.*, pp. 24-26. Accordingly, based on the evidence before the Court, plaintiff has failed to meet his burden of showing that he is substantially limited in the major life activity of lifting.

**4.   Exiting patrol vehicle / standing up**

Defendants also make passing reference to plaintiff's difficulty in repeatedly exiting the patrol vehicle, arguing that such difficulty does not constitute a substantial impairment to a major life activity.

27

*Motion for Summary Judgment*, p. 20.  Plaintiff does not respond specifically to defendants' argument.

An "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation" under the ADA.  *Mahon*, 295 F.3d at 590-91.  The evidence establishes that plaintiff can exit other vehicles, such as a sports utility vehicle, without as much difficulty.  *Quinn Depo.*, p. 32.  Plaintiff is able to get out of bed without assistance.  *Id*. at 30.  Plaintiff also testified that he can use the restroom on his own and stand up from a chair without assistance.  *Id*. at 29-31.  Dr. Monroe opined, and plaintiff agreed, that plaintiff can stand for eight hours.  Exhibit 8, p. 3; Exhibit 9, p. 1.  Based on this evidence, plaintiff has failed to show that he is substantially impaired in standing (exiting a vehicle).

**5.    Working**

Defendants contend that a special analysis applies to the category of "working" and that plaintiff is not substantially limited in working because he is currently working full-time and is not precluded from a substantial class of jobs.  *Motion for Summary Judgment*, pp. 22-24.  Plaintiff does not respond specifically to defendants' contention.

As noted by defendants, working is treated "as a residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity."  *Mahon*, 295 F.3d at 590.  Therefore, having determined that plaintiff is not substantially limited in any other major life activity, the Court may analyze whether plaintiff is substantially

28

impaired in the major life activity of working.

> To be substantially limited in the major life activity of
> working, then, one must be precluded from more than one type
> of job, a specialized job, or a particular job of choice.
> If jobs utilizing an individual's skills (but perhaps not
> his or her unique talents) are available, one is not
> precluded from a substantial class of jobs. Similarly, if a
> host of different types of jobs are available, one is not
> precluded from a broad range of jobs.

*Id*. at 591 (quoting *Sutton v. United Air Lines Inc.*, 527 U.S. at 492).

Whether or not plaintiff is precluded from a broad range of jobs is

determined by plaintiff's access to jobs in his geographic vicinity

compared to a non-injured worker's access. *Id*.

It is undisputed that, since July 2007, plaintiff has worked as a

campus safety director for the University. *Quinn Depo*., p. 16. His

duties include performing administrative tasks while sitting at a desk

and walking around campus. *Id*. at 18. In addition, as discussed

*supra*, plaintiff's only specific restrictions are his inability to sit

in a confined position and inability to repeatedly get in and out of a

patrol vehicle. Dr. Monroe reported that other than these two

restrictions, plaintiff "is able to perform all duties expected of a

Patrolman." Exhibit 17, p. 2. Dr. Rubley similarly reported that

"the only restriction I would have on him [plaintiff] is not working

in a confined area for proper posture and head movement." Exhibit 25.

Plaintiff testified that he could perform his job duties as Sergeant

with the Patrol if there were no shotgun rack or cage in his car.

*Quinn Depo*., pp. 64-65, 68.

This evidence establishes that plaintiff was limited in a very

narrow manner, which made it difficult for him to perform some of his

duties in his former position. However, being precluded from some

duties of this specific job, particularly in light of plaintiff's admitted ability to perform other jobs, is insufficient to establish that he was precluded from a broad range of jobs. *Mahon*, 295 F.3d at 591. Therefore, even accepting all of plaintiff's assertions as true, plaintiff has not presented evidence of a substantial limitation in the major life activity of working. Accordingly, plaintiff cannot prove that he is disabled within the meaning of the ADA.[12]

Because plaintiff has failed to establish a *prima facie* case of discrimination, the Court need not consider the remaining steps of the *McDonnell/Burdine* analysis.[13]

**WHEREUPON**, in light of the foregoing, *Defendants' Motion for Summary Judgment*, Doc. No. 32, is **GRANTED** in its entirety.

---

[12]In his *Response*, plaintiff contends that "the agreement of three out of four independent medical examiners as to the status of his condition [thoracic scoliosis as a permanent impairment] qualifies his impairment as a legal disability under" the ADA. *Response*, p. 3. However, simply having an impairment is not enough to state a viable ADA claim: plaintiff's impairment must *substantially impair*, as that term is legally defined, a major life activity. As discussed *supra*, plaintiff has failed to show that he is substantially impaired in any major life activity.

[13]The parties dispute at length whether or not defendants offered plaintiff a reasonable accommodation for his impairment and whether or not plaintiff has sought reinstatement. *Motion for Summary Judgment*, pp. 11, 24-27; *Response*, pp. 1-4. Plaintiff understands that he has until November 27, 2008 to request reinstatement. *Quinn Depo.*, pp. 161-63; Exhibit 21. Defendants advised plaintiff that he can request reinstatement in accordance with Ohio Admin. Code § 123:1-33-04 (2000). Exhibit 21. The current version of that section provides, in part, that "[a]n employee may make a written request to the appointing authority for reinstatement from a disability separation. An employee may not make a first request for reinstatement until three months from the date the employee was no longer on active work status." Ohio Admin. Code § 123:1-33-04(A) (2007). However, having determined that plaintiff is not disabled under the ADA, the Court does not reach any conclusion on whether or not plaintiff is entitled to reinstatement. Therefore, the Court expresses no opinion as to whether plaintiff's requests in March and December 2006 satisfy the requirements under the Code that, among other things, plaintiff's request for reinstatement be in writing and made to the "appointing authority." *Response*, p. 2; *Quinn Depo.*, pp. 103-09, 169-72; Exhibit 27.

The Clerk shall enter **FINAL JUDGMENT** in this case.


September 24, 2008                    _s/Norah McCann King_
                                     Norah M<sup>c</sup>Cann King
                             United States Magistrate Judge